25-1126. Are we ready? Okay. Good morning. I'm Leslie Hirst, Counsel for Appellant that I will collectively refer to as Wyble. The District Court dismissed this false advertising case on the pleadings, deciding the two court questions a fact as a matter of law. And those questions are, what advertising message was conveyed to reasonable consumers and is that messaging false? It's black-letter law that the message conveyed to consumers is based on the net impression of the label as a whole. You look at the entire mosaic of the advertising, not the individual tiles. Can I? Sorry to jump in so fast, but this is one of the issues I'm sort of stuck on a little bit. That argument draws from the law as it relates to sort of the merits question of whether it's, whether they've plausibly alleged a deceptive label. Is that the same question we ask when we're considering the preemption question and we're considering whether the nature of the claim is a disease claim versus a structural function claim? Do we ask what the effect would be on a reasonable consumer in trying to sort that out? Yes. It is really the same analysis because it's, well, what advertising message is conveyed, you look at the entire label, how a reasonable consumer sees it. And it is the same if you're looking on preemption. Does the label convey, in the terms of the FDCA, a structure function claim? Does the label convey to reasonable consumers a disease claim? And you, it's, it really is the same analysis. You look at the entire label as a whole and you ask what message is conveyed to reasonable consumers. Your claiming here is that this is a disease claim, aren't you? We don't use that. I understand. I'm, you know, I think you argue both in some ways, but a disease claim is, is, it's an implied disease, I think you're arguing, because of the use of the word osteo. Is that correct? That's correct. The parties don't dispute and the district court said, look, it, it, there's what the district court called a general joint health claim. So we did focus on the implied message that we allege is conveyed by the label. And you're correct, there, but we allege there's a number of components of the label that read together convey an implied disease message or we say an implied symptom relief message. But you, in addition, though, to, to determine what message is conveyed by the labeling, you don't just look at the label, especially for an implied message. You look at extra label evidence and here Weibel has alleged a range of extra label evidence from which the court can and should plausibly infer that an implied disease message is, is conveyed. So I think one response to that from the other side is that they, they can't, they don't control some of the messaging and, and, and representations about what it does and that you're including those within the assessment of, as to whether or not a disease claim is what a reasonable consumer would. How do we, how do we think about that? And that's part of my question. And then just to go back to Judge Robinson's question, for the proposition that we, that even for the preemption analysis purposes to assess whether it's a disease claim or a structure function claim, that it's the same reasonable consumer analysis and that we look, what's the, the support authority for the proposition that we look at, at everything? It's a two-part question. Okay. On, on the first part of your question, we do have some allegations that, for instance, retailers market this as an arthritis cure. You know, they market it for arthritis pain. But we also allege that Nature's Bounty controls how those third parties advertise their product. For the spokespersons, they hire those people, they control what they say. That would presumably be necessary in order for us to include that within the assessment of whether a disease claim is, is plagued. They say it is, and we allege it. But I would also like to point the Court to the extensive consumer surveys and market research that we allege, from which the Court can and should infer that there is an implied symptom relief message. I'm thinking of there's Gallup polls we cite where the target market for this product, the people that they aim to sell the product to, are osteoarthritis sufferers and older people that have joint pain. We allege surveys that the people that actually buy this product, the majority of people that buy it, one survey found 68 percent, people that buy the product have osteoarthritis, and most people who buy it, buy it for arthritis symptom relief. These are facts that need to be taken as true. And when we allege facts that it's marketed to this group of people and this group of people buy it, it's a reasonable inference that the people buying it for arthritis symptoms are buying it because they are receiving a symptom relief message. So there's, there's an argument, I think, that in the back and forth and the drafting of the regulations. Did I just get you on? Well, there was a second part of my question. Sorry. A follow-up to yours, but. Go ahead. So the authorities that under the FDCA, you also look to the reasonable consumer standard. I would point the Court to the FTC guidance that we cite. I would point the Court to the FDA guidance that we cite. We cite two FDA guidances. And I would point the Court to the Federal Register. Those sources, especially the FTC and FDA guidances, are clear that when they tell manufacturers, you need to look at how reasonable consumers are reading your label. You need to look at if reasonable consumers are receiving a structure function claim, but also an implied disease message. So that would be the authority for that. And I think this is a follow-up to that. And I don't have the citation in front of me. I'm sorry. But there's an argument that in drafting the regulations about the sort of what I'm going to call the safe harbor for structure function. It's not quite what it is. But that the agency specifically adopted language that would ensure that people didn't have to get consumer surveys to sort of address this. Am I misremembering that argument? And what's your response to it? They do make that argument. And that argument is wrong. If you look at the pieces of the Federal Register that they cite, they say there's one narrow swath where you don't look to consumer understanding. And that is for the characteristic signs and symptoms of a disease. So if you're going to list joint mobility, joint structure, joint stiffness, those are characteristic signs and symptoms of arthritis. And to determine that for that narrow thing, you don't ask consumers. You look at objective sources like medical texts. Then you have to weigh it against what the labels are, right? I mean, if the labels are basically appear to be structural and functional, then it seems to me that that weighs pretty heavily in the mix, apart from why people might buy it. You know, you might buy it for both, actually, at the same time. And we say, yes, there can be two labeling messages. It's not structure, function, or disease claims. A label can convey multiple messages. And that's established law. And so we're alleging that it can convey both messages. It's not an either or. And so, yes, the label makes structure function claims. It also implies that it has arthritis uses. And so that's, I mean, and we don't just allege it. We have facts supporting it. Pardon me? The other side has an answer to that. They say osteo means bones. It doesn't mean arthritis. And therefore, it strengthens joints. It improves flexibility of joints. And those claims are really not an issue here. If those are the claims that we're dealing with, then you don't win. Well, osteo means bones. If a consumer was walking through the aisle of a grocery store with a dictionary under their arms and looked up osteo and saw that its etymology was bones. But you look at how a reasonable consumer walking down a grocery store is going to read that. You look at the label as a whole. Osteobiflex, that label, that term is surrounded by claims about joint health. There's nothing on here referencing bones. It's reasonable that when you see osteobiflex surrounded by joint health claims, surrounded by promises to help the cardinal symptoms of osteoarthritis, and there's no dispute these are the cardinal symptoms. Joints have something to do with bones. I mean, that's the joint. Two bones. But osteo, there's multiple things about the label. I think we allege five or six things about the label. It's not just the name. It's the name. They say improves joint comfort. We don't just say that means to consumers no joint pain. We cite a consumer survey where the survey found that to consumers, to the people reading the label, improves joint comfort means no joint pain. I mean, we allege that glucosamine to consumers means no joint pain, is a pain relief product, glucosamine is. Again, we don't just have the bald allegation. We cite to a survey which says that. What if consumers, as a general matter, understand statements about structure and function to be about pain? Then if that were true, then there would be no distinction, right? Like if any, I mean, I assume there are such things in your mind as structure function. I like to say statements so as not to confuse it with claims. If there are structure function statements, but it turns out that consumers sort of always understand structure function statements to be about pain or disease, what then? In that case, under the rules of the FDCA, then it is an implied disease claim. It's not always going to be the case, and potentially it is here. But the FDA accounts for that. In the FDA small entity compliance guide, they say there are many conditions that are normal, the structure function claims, but under certain circumstances are also disease claims. So, yes, it could be that reading what, in one context, may always imply that to consumers. In which case, they can't make those claims. And can I ask a follow-up to Judge Walker's question? I understand the arguments about what we look to in the reasonable consumer analysis for assessing at the pleading stage whether disease claims are made. Assume for a moment that we don't think it makes out disease claims. Judge Walker sort of said, then you lose. Walk me through the nature of your argument if what we're talking about are structure function claims. I gather you don't concede that you lose in that case. Correct. If they are structure function claims, so they make only these general joint health message claims, yes. We have studies which show that those claims are false. And so then the question is, does this complaint, assuming all inferences in your favor, adequately, plausibly plead a lack of substantiation of the structure and function statements? Is that the right way to think about it?  Do we plausibly allege that those claims are false? Do we plausibly allege falsity under a false advertising statute? And, yes, we do. Because we cite the bioavailability studies which show these products never make it to the bloodstream, let alone to the joints, because we have six studies that we cite on healthy joints showing that it does nothing for the structure or function of joints. So, yes, even under that scenario, we think the claims are not preempted and we have adequately pledged a ‑‑ Were these studies fundamentally of people with osteoarthritis or people who were, you know, had a disease problem and, therefore, weren't isolated for structure and function? No. We cite studies, bioavailability studies, for instance, were not on people with osteoarthritis. And we do allege studies that were on people with normal, healthy joints. And they tested, does this product do anything for the structure or function of their joints? Do they bend better? Do they move better? Are they more flexible? Are they more comfortable? And the studies found, no, it does nothing. It does nothing. So not all the studies are on, does this prevent the disease of osteoarthritis? And disease prevention is generally measured by bone space width. So if a study looks at the bone space width, that part of the study would not be relevant to show the structure function claim is false. But we have a number of studies that show that, regardless of whether it prevents osteoarthritis, it doesn't help with the normal joints in day‑to‑day life. So I have a couple of questions about substantiation. Pardon me? Substantiation. One is, there was a question about whether you adequately plead absence of substantiation. You said you had. And for this purpose, maybe my question becomes academic. But is it your burden to plead absence of preemption, or is preemption an affirmative defense that's resolved as a defense? Preemption is an affirmative defense that they have the burden to bring and plead and prove. And so we are not at that stage yet. But we have to make sure your complaint doesn't, on its face, establish their defense. Is that the question you're asking? Correct, correct, yes. I'm trying to understand how a couple of the pieces of the law fit together. So 21 U.S.C. 343A, that's the general mislabeling provision, says food is misbranded if it's labeled as false or misleading in any particular. So to litigate that, you would look at all the evidence that both sides bring once you get to the litigation, not at the pleading stage. Correct. Ultimately. 21 U.S.C. 343R6, which is this structure function piece, says they can make claims if three requirements are met. And one is that the manufacturer has substantiation that such statement is truthful and not misleading. Is the question whether the manufacturer has substantiation that is truthful and not misleading essentially the same as the question whether it's false or misleading? Yes. And if so, why did the statute use that wording rather than, because it feels like they're trying to create some sort of special carve-out, but then if that means the same thing, why is it there? I agree the has substantiation language is a little confusing. It is the same analysis. And I would direct the Court to the Ninth Circuit Crossler decision, which is directly on point here. Because it says that plaintiffs can challenge their substantiation for the claim. If they have tests proving the claim is true, we, private litigants can challenge that. And when you challenge that, what the court does is you look over the fact finder, you look at the entire evidence, the entire body of science, you weigh it, and you determine is it true or false. So it is the same analysis. And Crossler is a preemption case under the FGCA, so it considers this exact question and answers it that it is the same analysis. I notice you have a box. Is the box that you were showing the same as the boxes that are depicted photographically in the record? Yes. Would there be any objection to having them file that after the argument so that we could actually see it? So if you could do that after the argument, we could see what we could have. Yes, I also find it. That's why I carry it around. I find it helpful to look at it. Yes, you can get the full effect. Well, we're going to give a chance to ask you some more questions, but I think for now we'll head to your colleague, Attorney Flint. Thank you, Your Honors. May it please the Court, Casey Flint on behalf of Appellee Nature's Bounty. Your Honor, I'd like to start with one of the first questions, which is, is the inquiry the same under the FGCA about whether a claim is a structured function claim and under state law about whether a claim is true, and how do you understand that? As Your Honor, Judge Nathan pointed out, the plaintiff's theory is that claims about joint health, joint comfort are actually implied disease claims because consumers will understand references to joint comfort, joint health to mean the absence of disease. Just your question, what do we do if consumers read structured function claims to be absence of disease? And we know the answer to that question. The statute creates two distinct categories, healthy states, disease states, and if a plaintiff claims that a claim about a healthy state, joint comfort, must be treated as a disease claim because consumers will understand it that way, that collapses the statutory distinction. The Ninth Circuit held in Dockour that an argument just like this about heart health being equivalent to the absence of cardiovascular disease, the Ninth Circuit said that vitiates the statutory distinction, so it's not permitted. So, but we still have to look at the label and figure out what the claim is without regard to what a consumer survey says a consumer says. And so I'm trying to sort of, I'm struggling with that in this one, especially at the pleading stage, and I know there's this whole question about extraneous evidence, but the Ninth Circuit at least thought that that was a legitimate consideration. Okay. The, you don't disagree that if the label said reduces joint pain. That would be a disease claim, yes. What if it said reduces joint discomfort? I think discomfort is equivalent to pain. Joint comfort is something different. So, that's where my mind is sort of blown. I understand it's not intuitive, but that's exactly why the FDA says we look at objective sources and not consumer understanding for exactly this reason. How is, how, I think of myself as an objective person, and saying that something increases comfort when you're talking about a joint. Now, if you're talking about somebody's comfort on a couch or something, you know, there are things other than pain, but I can't think of anything joint-related that would be comfort that needed to be improved that wasn't pain. Well, let's say one day you can stand for 60 minutes and you start to feel tired. After you take a dietary supplement, you can stand for 70 minutes, 90 minutes, without feeling tired. That's an increase in comfort. The, it's moving from one comfortable state to another comfortable state. You're talking about comfort. What are you talking about? Is that the absence of pain? It can't be under the federal statute because those two things are distinct claims. You're saying that tired, it can be used for improving joint function in the sense that you're tired, you're not as tired as you would be otherwise. That's right. But. Strengthening, sorry, excuse me. Well, I mean, it's a very fine distinction, isn't it? It absolutely is, which is precisely why the FDA has been clear that FDA guidance on this should be determinative, not consumer understanding. So where does FDA guidance, I mean, they give lots of examples and this isn't any of them. The word comfort isn't, but maintain joint cartilage, maintain joint function, those are in the FDA preamble. I have to tell you that for me the thing I'm most hung up on from the perspective of disease claim is shows improved joint comfort within seven days. I can't get my mind around what that could mean other than you're going to have less pain within seven days. I don't know what improved joint comfort otherwise could mean. Tell me where the FDA guidance is that tells me my intuition is wrong about that. The FDA talks about using the word improved. It said that is okay as long as you're talking about healthy states. And comfort, like health and immunity, strength, those are all healthy, positive states. Where does the FDA say that? Where does it say, health? No, comfort. I want to understand, if you're improving comfort, then there's some way in which your comfort is falling short. Your increased strength can make it comfortable to run upstairs, whereas previously you were comfortable running across a flat surface. There are ways to improve joint comfort because it's as a healthy state, and it's going from one healthy state to an increasingly healthy state. The Ninth Circuit signed off on this exact product. Of course, the court knows in Siegert. But on joint comfort, a different panel of the Ninth Circuit and Frosler also said, joint comfort is not a concern. Joint comfort is a healthy state, and moving from one healthy state, joint comfort, to another, improved joint comfort, both are on the Of course, they actually remanded to allow repleting with more allegations than were present in that case that are here, right? So it's not In Frosler, that's true. But the words joint comfort, no concern. And in Siegert, the court held the joint comfort claim on these same products is a structure function claim as a matter of law. How do you know you need to, if you're a consumer, how do you know you need a Nature's Bounty product if you're not feeling some discomfort? I mean, you're feeling comfort, but you want to feel more comfort. But that's usually not a signal to go to the store and buy a supplement, is it? If I could point the court to the FDA's guidance on how to think about consumer understanding of claims, I think that will help answer your question, Judge Walker. So as we've noted, the FDA has specifically excluded reference to consumer understanding in its final rule. And let me tell you some of what the courts, the FDA said. So it said, removing the reference to recognition by consumers will permit a clearer distinction between those signs and symptoms that imply a disease and those that do not. The exact question we're asking here. The court said we're removing recognition by consumers from this inquiry because of the exact questions that Your Honors are asking. It's going to be hard to divide the line. Do you disagree that our assessment is what a reasonable consumer would think? You're saying we do that analysis, but we may not look at consumer studies? I disagree that that is the assessment under the FDCA. The FDCA asks whether a claim states that a nutrient or dietary ingredient will affect a function or structure of the human body. It does not ask whether a reasonable consumer will understand a claim to mean that. And the FDA has been very explicit in saying we don't consider consumer understanding in this inquiry. But so how do we actually do that analysis? What does that analysis look like? We're just saying some objective standard, just objectively. That's right. All inferences in the plaintiff's favor, could a reasonable jury objectively conclude that this is a statement about pain? Respectfully, this isn't a jury question. This is a legal question for the court, even if there's a factual dispute, which I don't think there is. You're on that. Objectively, objectively, I don't know. What are the words I put in my head to ask the question? You ask, is the state that the claim describes a normal, healthy state or a diseased state? And that determines the question. And I just want to completely understand the questions you're asking, and so does the FDA. If you look at the examples in the Fed Reg that we've cited at length, it's not easy. Here's a good example. So acne, that is a normal, healthy state. People's normal, healthy skin gets acne. So a product that says helps acne, helps with acne, that is a structure function claim. Cystic acne, by contrast, is a diseased state. So if a consumer with cystic acne saw a product that said helps with acne, they may well think that helps with their condition. Just like plaintiffs argue that a consumer with osteoarthritis might think a product that helps with joint comfort may help their condition. Nonetheless, the claim that is talking about acne, which is a healthy state, that is a structure function claim. But less than comfortable joints is not a healthy state. Comfortable joints is a healthy state. More comfortable joints is also a healthy state. Joint health, joint strengthening, joint function, those are all normal functions. Joints that need improvement in comfort are not a healthy state. I guess I'm really struck. So can you give an example of the FDA guidance? Which example is closest to what we're struggling with here? Okay, well, factually closest is maintains joint cartilage. Your Honor's question earlier might say, who would want to maintain their joint cartilage except someone who is having a problem with joint cartilage? So maintain is sustaining the current state, and joint cartilage is kind of a neutral thing. We all have it. It exists, and you're keeping it, right? That's not – What if it said improves joint cartilage? That's equally the case. That's not an example specifically listed, but they do talk about improves being permissible as long as it is about a healthy state. So improving and creating a more healthy state.  A healthy state is around – We're on the healthy state side of the line. I mean, you know, body functions can be on a spectrum, healthy here, disease here. What the FDA does is we draw a line in the middle, and as long as you're on this side, that's a healthy state, even if you're moving from here to here. The non-label statements, I want to go through those, and you tell me where they fall and why, and then get to the question of whether those should be considered or not, okay? So pharmacists say helps with occasional joint flare-ups. So if the label said helps with occasional joint flare-ups, that would fall on the disease side. Flare-up probably implies pain. Okay, and then there's testimonials by athletes, credits osteobiflex with helping him play pain-free disease side, right? He said, I had back injury years and years ago, and this makes it move better. Move better, that's okay. But pain-free? References to joint pain relate to osteoarthritis. So therefore, that's on the disease side. Well, probably.  And then the press release, athletes can easily succumb to body aches and increased concerns about joint comfort. Osteobiflex is focused on providing support. Joint comfort and support are 100% on the healthy side of the line. Okay, so, and I think I agree with you on that. The first two would fall on the disease side. So why don't we consider those if they're allegations that you have control over the testimonials and the like? Well, a couple of things. First of all, this, of course, is a complaint about plaintiffs who allege that they saw the labeling. There is no allegation in the complaint that these plaintiffs saw any of the things you're referring to. Is there an inference available that if they had these assumptions and that marketing is out there, that it was, that they saw it? No, there's not. The complaint is explicit that the plaintiffs bought the products based on the labeling. And there's no inference that anything outside of the labeling, like the consumer research studies, anything else, that this plays any role. Again, the FDC was quite explicit about this. It said part of why it eliminated consumer understanding is that it's implementing D. Shea's purpose of creating a rational federal framework that avoids a patchwork regulatory policy. And so the FDA said, and I'm- So you want to exclude consumer understanding, but you want to require the plaintiffs' understanding as part of the assessment? All of the plaintiffs' claims require that they either relied on something that they saw or something that they saw caused the alleged injury, which is purchasing the product. So I don't think there's any way in which things they didn't see has any connection to any of their claims. And I also- I think this step is this objective- Maybe I've lost where we are in the doctrinal analysis, but I think we're asking the preemption question, which you said is this objective analysis. You're saying that could only be based on labeling or it could only be based on more than labeling if there are specific allegations of these plaintiffs having been influenced in their purchases. I guess I'm a little confused. Thank you. I think I understand the question. So the structure function claim question that is at the heart of the case, that is based on labeling. The- it is about whether the claims imply treatment of disease or whether they only relate to structure or function. Now, the plaintiff has cited some sources to say that this inquiry involves something beyond the labeling, such as maybe what retailers say about it or how consumers understand it, as we've just been discussing. Those sources don't support their argument. Kroszler, which Your Honor referenced, Kroszler talked about extra-label evidence. It was very explicit that when it was doing so, it was not delineating what types of evidence a court may consider when evaluating implied disease claims. So when it talked about that, in its own words, it was engaging in dicta. And with respect to that panel, it made a mistake. So in footnote 9 of Kroszler, it said, courts have held that consumer understanding, market research, all these things that we're talking about, Judge Nathan, are relevant to the inquiry of what counts as a structure function claim. It cited two cases. Both of those cases are on a different subject, which is intended use of a product. So if a label claim makes an implied disease claim, that means it is regulated as a drug under the FDCA. But there's a whole separate way that a product can be regulated as a drug under the FDCA, and that's if the manufacturer intends that it be used as a drug. Those cases that Kroszler cited were about that second thing. Those were about evidence that can be considered to determine whether a manufacturer intends that its product be used as a drug. And that is not part of this case. The plaintiff has not alleged that our product is intended for use as a drug. They couldn't. They are not allowed to enforce the FDCA. But that's not part of this case. So Kroszler mixed up those two inquiries. Whether a structure function claim is a structure function claim, whether a claim on a label is a structure function claim, is determined exclusively based on what the label and labeling say, and not by reference to consumer studies, market research, extraneous factors. And if I could just read, I think there's a really helpful quote from the FDA's preamble that says, we're adopting the final rule, the one that eliminates recognition of signs and symptoms by consumers, to create, I'm quoting here, uniform enforceable requirements for structure function claims and establish a, quote, level playing field for all members of the dietary supplement industry. There has to be a consistent understanding of these things, because otherwise we wouldn't have the rational federal scheme that D. Shea enacted. And yes, as Your Honor's questions imply, it is not always easy to understand what counts as a structure function claim or an implied disease claim. But that is why FDA determines that. You know, any time a dietary supplement manufacturer puts a structure function claim on their product, they need to report that to the FDA within 30 days. The FDA reviews these. The FDA follows up on claims that it concludes do not constitute structure function claims. This is all a matter of public record. You can look at the FDA's website. So we infer from the fact that there's no allegations that the FDA rejected this as a structure function claim when it was filed that the FDA has somehow blessed it? You can infer that. You can look at the FDA's website and see that that is true. The Ninth Circuit obviously blessed it in both Siegert and Bosley. Do they actually issue some statement, or do they just? They issue letters if they have concerns about a label. But if they don't, they say nothing? There wasn't a letter about osteobiflex years ago, an issue that is no longer on the labels, and no concerns about the issues we're talking about today. What's your answer to the legal question I asked your colleague on the other side about how to understand their relationship? Do you agree that the question of whether the manufacturer has substantiations of the truth and that it's truthful and not misleading is essentially the same as whether it's false and misleading? I do not agree with that. Tell me how you would understand those two different words and what they mean. Sure. Again, this is an area that both the Ninth Circuit and the First Circuit in Ferrari have talked about. And just one quick moment back, Ferrari also talks about this consumer understanding question and says that is not part of the inquiry about whether something is a structured function claim. So that's two circuits that have said that, the Ninth Circuit in Siegert and the First Circuit in Ferrari. All right. To answer your question about substantiation. So what the statute says is that the manufacturer needs substantiation of the structured function claim. And what that means is they must have substantiation that the nutrient or ingredient has that role on the structure or function of the human body. Well, it depends on what the claim is, right? I mean, I think what you're saying now about the nutrient, that would be if you're making a claim about a nutrient, right? If so, the statute and the regulation distinguish between the ingredient or nutrient on the one hand and the product on the other hand. Structured function claims are about the nutrient or ingredient. In our case, that would be 5-loxan, the form of Boswellia serrata that's in our product, or glucosamine. So that's what structured function claims are about. And disease claims are about products. Right. So the question is that, so you're not disputing the Kressler case's determination that at the end of the day, you have to look at the whole body of evidence to determine whether they have substantiation. The manufacturer can't pull up one study, even if it's discredited by everything else in the world, and say we have our substantiation, we have our get-out-of-jail-free card on this. It is possible to claim that a dietary manufacturer lacks substantiation. But I want to be clear that substantiation is not the same thing as, you know, no one disagrees, or when I've considered everything, you know, this is conclusive. Substantiation is reasonable and competent scientific evidence. And the statute actually distinguishes health claims have to be supported by significant scientific agreement. So that is different. That is more support than is needed for structured function claims. For structured function claims, it's only substantiation. So here, the complaint alleges a number of studies, including a number of studies performed on people who aren't, don't have a disease state, right, who aren't suffering from osteoarthritis. And including Petri dish studies, I mean, dealing with the way that these nutrients are absorbed into the body. Why, as to preemption, why isn't that enough to get them past what I'm gathering is your affirmative defense of preemption? But what they, it's not just an affirmative defense. They cannot allege we violated a State law that would impose a requirement different from D.S.H.A. Right. But is the, so the question is, so when you're saying you're imposing greater requirements than Yes. The regulations, that's not a defense that You're not saying the claim's out, right? You're just saying it has to be the same. It has to be It cannot, we cannot be held liable under any State law that would impose a requirement that is not identical to the requirements of D.S.H.A. But so then the analysis is just the same. It's not that, right, you interpret the State, essentially interpret, this is how I understand this, tell me if I'm wrong. You interpret the State law as being the same as the substantiation requirement. And then you ask a sort of 12b-6, does it state a claim under the substantiation test? That's We're done with the preemption analysis once we make it the same substantiation test. That would be And then we move on to the 12b-6 analysis. Right. So we assume State law has to mean substantiation, otherwise it's preempted, and then we evaluate whether the complaint states a claim under substantiation. Right. And I think that is how the Court analyzed similar questions in Critcher and Jackson now. And it's how the Ninth Circuit in Greenberg and the First Circuit in Ferrari analyzed similar questions. But so then if we're doing that to Judge Robinson's question, if you look at the studies, I mean, as I understood, I think what the district court said is things like, well, that study was about wanting only one ingredient or that study was about joint pain rather than just joint health. But it seems to me that inferences that are relevant to substantiation could flow from those studies. So why aren't they sufficient? And I think here, let me ask this, just as background. This is a jury question, right, ultimately, because we're talking about ultimately at the end of the day, this is not a preemption question. It's a liability under State law question where State law is substantiation. I think the judge will have to — the court has to determine whether it's preempted. Right. But, okay. Okay. Setting that aside. So on the topic of — But let's say I fully agree with you on the preemption point. Then I think what's left is, does the State acclaim under State law where State law requires a lack of substantiation to establish a claim? And the answer is it does not. And I'd like to tell you why the inference is — But is that analysis right? Well, as long as the entire substantiation requirement of Federal law is taken into place. Exactly the same. And I think you asked the question, do inferences from these arthritis studies, don't those support substantiation even though our claims are not about arthritis? And the answer to that question — Well, those support lack of substantiation. The answer to that question is no. Those do not support a claim for lack of substantiation because we don't make any claims about arthritis. So an allegation that our product didn't help someone, or these allegations are not about our product, but that, you know, some formulation of glucosamine or whatever did not help somebody who had arthritis. I think this is the study — correct me if I'm wrong. It doesn't help arthritis — assume this to be true. If the study shows it doesn't help arthritis because it doesn't get to the joints, it doesn't get to the knees, you could then — Or it doesn't get to the area. So I think you're asking about two different things. Yeah. Let me just — the arthritis cases, those are out under the Ninth Circuit's decision in Dock Hour because it's a mismatch. If the claim doesn't talk about arthritis, any study about arthritis per se or arthritis — Why couldn't arthritis studies have inferences that would be relevant to joint comfort? Because — so I think what you're talking about is the bioavailability studies. Probably. And I don't think those inferences are supported in the arthritis studies. Now, they have also pointed to bioavailability studies, which I think you're thinking of. And those don't help them either. And this, again, is an area of Federal law that is perhaps not entirely intuitive, but it has been addressed by both the Ninth Circuit and the First Circuit in published cases, which plaintiffs would be asking this Court to depart from. So in Greenberg and in the Ninth Circuit and Ferrari in the First Circuit, both of those courts talked about what substantiation looks like under this statute. And they said — The thing — first of all, efficacy is not a part of substantiation. So you — the claim that — Even if there's a claim that is — that says — if the claim is in proof that these nutrients, it's not this — well, the claim is this product improves joint comfort. It's not the claim. The claim says improved joint comfort. It doesn't say this product. And it doesn't — it's not about the product. Okay, it's about the nutrients. It's about a particular ingredient. That claim is about five locks. So if there's a bunch of studies about each of these ingredients, and at least some of them are performed on groups that include or comprise people without diagnosed arthritis, why doesn't that get past the pleading stage on this issue? Okay, two different reasons. First, on the improved joint comfort claim. So that claim is supported by two studies. They're actually even referenced on the package that will be filed here, which showed that — Which were on people with osteoarthritis. They were. They showed that individuals had improved joint comfort within seven days when they took five locks in, which is a particular proprietary form of Boswellia serrata. Just to pause on those studies for a moment. By the way, they are cited in the complaint. They're in the record before the court. These are both randomized, placebo-controlled, double-blind studies on human subjects that are published in peer-reviewed journals. Now, if you look at the FDA guidance on substantiation that the plaintiffs have relied on, it describes that kind of study as the gold standard of substantiation. So we've got two of these studies that show that five locks in does indeed improve joint comfort within seven days, cited on the product and referenced in the complaint. Now, Your Honor asked before, can you just say I found one thing and that's enough? What we have here is two gold standard studies that the FDA says, manufacturers, get things like this to substantiate your claims. We've done that. So here's one of the things I'm struggling with, though. Your studies draw inferences about the effect on a healthy state of this proprietary ingredient, based on a study of people with osteoarthritis, but you simultaneously take the position that for purposes of evaluating whether that's true, nobody else can draw inferences from studies that include people with osteoarthritis. That feels inconsistent to me. I hear you. It's a one-way ratchet. That is just how the statute is drawn. The statute says we want dietary supplements to be generally available. We want truthful information about them to be out there. We think this is fiche. The Congress says we think these are safe. We want people to have access to them as long as they're safe. Isn't it a one-way ratchet at the pleading stage, where a plaintiff does have studies from which those inferences could be drawn? It is. That's exactly what the Ninth Circuit held in Dock Hour. It said, as a matter of law, you cannot rely on studies that say an ingredient or a product doesn't help with a disease state to argue that a structure-function claim is false. If we allow that, the statute, which explicitly distinguishes these two things, mashes them together, and we can't do that. But even the studies, I think maybe I'm looking at the summaries of the studies, and maybe I'm reading them differently, but there's a number of studies, first of all, that were performed on people who weren't diagnosed as having osteoarthritis, and they made findings. I'm thinking about the DeVos and the Tenet studies, and they made conclusions about impact on joint pain or comfort and function and things like that. And then we have these bioavailability studies that knock the knees out from under the sort of idea that these ingredients would have any impact in a healthy disease state on the joints. Again, if you're asking this to me. These are great questions, and I'd love to answer both of them. I think you answered, I understood, two separate questions. First, you asked about Tenet and DeVos, which you understood to be about healthy populations. So let me just tell you Tenet, which the plaintiff summarizes saying the ingredient MSM did not work on anyone. What it says is, I'm quoting here, MSM has been shown to exert anti-inflammatory and antioxidant effects. Medical trials in humans have demonstrated that MSM was superior to placebo in controlling pain related to mild to moderate osteoarthritis of the knee. Tenet found what that study found was that a small daily dose of MSM taken by young people in the military didn't help those people. And it said this conclusion is less translatable to the average person. So Tenet would support an argument that we can't claim, you know, MSM will make young people in the military have more comfort. Is that an argument that district courts deal with at summary judgment or at the merits not? It certainly could be dealt with at summary judgment. But in this instance, the studies are in the complaint. They're attached. This is their third amended complaint. This is their, they've tried repeatedly. They've had plenty of opportunities to handpick the complaints that best support their claim. And this is what they have. What I just read to you is evidence that MSM supports improvement in joint health, not in a particular population, people in the military, healthy people in the military, but it does support, Tenet just relates that it does support joint health. DeVos, that was the other study you mentioned, says that a large review found an overall significant beneficial effect of glucosamine on pain and function of the knee. I mean, it's very hard to understand a study which makes statements like that, demonstrates an absence of substantiation for a claim that ingredients in this product have an effect on the structure or function of joints. Doesn't FDA guidance require looking at the totality of evidence? I'm looking at. The FTC guidance. I'm sorry. FTC guidance, looking at the totality of evidence. FTC guidance does. Of course, this statute, the FTCA, this part of the statute, structure function claims, is administered by the FDA. And the FTC is explicit in the FTC guidance in saying this, we're not here to talk about structure function claims. That's within the FDA's jurisdiction. On the bioavailability studies. So you don't think FDA guidance is relevant? FTC guidance? FTC guidance. I'm sorry. I don't think it's relevant to this question. No. The FTC, to go back to where we started, the FTC focuses heavily on consumer understanding. That's its job. That's its role. And structure function claims, that's just not the question. As the FDA, which both agencies agree, the FDA is in charge of this, FDA has said that's not the inquiry for this purpose. I did want to address bioavailability studies. For one thing, just to pile on here, the Persiani study, that's one of the bioavailability studies, actually found glucosamine is orally bioavailable at concentrations that are in line with those found to be effective, which may explain the favorable clinical results in osteoarthritis. So one of the studies they have attached to their own complaint confirms bioavailability of glucosamine. But more broadly, their theory is that if you take glucosamine as a supplement, exogenous glucosamine, that's not going to help you because your body produces glucosamine that your joints use. The body has internal functions that use glucose to produce glucosamine that works to maintain the cartilage of your joints. And their theory is that supplemental stuff doesn't add anything. That theory is just like the one that was rejected by the Ninth Circuit in Greenberg and the First Circuit in Ferrari. Now, they've said, no, we're different from Ferrari because they say our argument is glucosamine never helps anyone. And they say Greenberg and Ferrari are about things that help people sometimes. But that is not what those cases are about. In Ferrari, the First Circuit heard a claim that the product there, supplemental glutamine, never helped anyone. I think the words in the opinion are that it's useless if taken as a supplement as recommended, you know, the product in that case. Can you clear up something then? If the body makes glucosamine, presumably there's a reason for it, and it serves a function. It serves a bodily function. 100%. But not everybody produces. One would think it's common sense that not every human being produces sufficient glucosamine. There could be a lapse in production for medical reasons of one sort, or maybe it had never even been discovered. But some people produce less than others. Is that also true? And therefore, would this supply the difference, this product supply the difference? I think you're Which is improving a joint. I'm not saying it's treating. I'm not even talking about disease here. Right. You may be beyond the record with this question, but certainly there are a lot of studies that show, including the studies cited in their complaint, that reference clinical effectiveness of glucosamine as a supplement. One of their studies, I think it's the Johnson study, if I have this correct. Sorry, Jackson. Excuse me. The Jackson study. That's one of the bioavailability studies. In that study, they looked at human chondrocytes in test tubes. And they said, well, we couldn't find, when we added supplemental glucosamine to these human chondrocytes, we couldn't find bioavailability. But then it said, look, the glucosamine is being evaluated clinically. And if we see clinical effects of glucosamine, if people have improved joint comfort from taking glucosamine, then that just means we weren't looking at the right thing when we looked at these chondrocytes. That means there must be some other mechanism. And their studies support that theory. But efficacy is not part of this. Efficacy of the ingredient taken in the form of the product, that is not part of the federal inquiry. That's what the court said in Ferrari. It's what the court said in, the Ninth Circuit said in Greenberg, and the First Circuit said in Ferrari. And I don't know any way to understand their complaint as stating a claim, other than to depart from those two decisions, which I would urge the court not to do. If there are no further questions, thank you very much, Your Honors. I would like to go back briefly to the thing we've talked a lot about, which is whether the message conveyed to a reasonable consumer, you look to extra-label evidence or whether you just look at the label itself. And the regulators and the courts are clear. In Crossler, talking about FDCA preemption, talking about these structure function claims under FDCA law, the court said, under FDCA law, as clarified by the FDA's guidance, close quote, the courts consider extra-label evidence. You look at market research on how consumers understand the labeling. You don't just look at the label in isolation. Look at the FDA guidance itself. This is the FDA talking about how it determines whether a structure function claim and or an implied disease claim is made. And it's this one. Don't you have to start with the statute? What is a structure function claim? What is a disease claim? And isn't that you can't ever disregard that. But the statute says a structure function claim talks about structure function. A disease claim talks about disease. But isn't it understood that that's going to be derived from the label? Derived from the label, but how the label is understood by consumers, you look to extra-label evidence. Because it's not how the label is understood, how claims in isolation could be read. It's how claims convey meaning to the people that are reading it. And for that, you look to extra-label evidence consumer testing. The FDA tells people, the FDA guidance tells manufacturers, if you want to know if your label is making a structure function claim and or a disease claim, you look to, quote, consumer testing is useful to determine consumer understanding. So, yes, the law describes a structure function claim. It describes a disease claim. But what is conveyed to consumers? Is it one? Is it the other? Or is it both? You may need to look to consumer testing. How do consumers read the label? Okay. And Frostler says it. Montero says it. The FDA says it. The FTC guidance says it. The 65 Federal Register says to determine implied disease claims. The FDA, the FDA is going to look beyond the label to other evidence of intended use. And that goes to my next point. There's not necessarily a clear line between a structure function claim and an implied disease claim. And the guidance documents say, depending on how the claim is phrased or the context in which it is presented, a statement about a product's effect on the normal structure or function of the body may also convey to consumers, and this is a quote, may also convey to consumers an implied claim that the product is beneficial for the treatment of disease. So it's consumer understanding that matters, and you look beyond the label to consumer testing to determine that. We've alleged the consumer testing, and we're at the pleading stage. The pleading stage, those are facts that the Court needs to take as true. A final point is my point. Would that ultimately be subject to adjudication by a fact finder, by a jury, or is the question of whether the label is conveying perhaps an addition to a structure function claim, a disease claim, is that a legal question that a court decides before it then submits the question of deceptiveness to a jury? That's actually a very good question. It is a question of, it depends on the posture, how it's presented. If it's a preemption, they have the burden to plead and prove. And you'll notice a lot of preemption cases are addressed on summary judgment. Preemption is a legal question, but there's factual determinations. If it's presented on summary judgment, the Court makes those factual determinations. The case we cite on that or a case on that is the Yamaguta case. Well, let me see if the Court makes those factual determinations. It literally adjudicates competing facts, or it determines whether a jury could conclude, whether there's a dispute of facts? I believe it's whether a jury can conclude, but you can do that on summary judgment. So on summary judgment, if they present... But if a jury could so conclude that it goes to the jury as to whether or not there's a preemption? No, I don't think it does. I think a court can decide the preemption, because preemption itself is a legal question. The Court decides that legal question. In determining the legal question, the Court can resolve facts. And that's the Yamaguta case. Yes, the Court can resolve facts in making that question. If it came up in summary judgment, I think the Court would make those factual determinations. If it went to trial and the jury was deciding what is the label message conveyed on the preemption defense, I'm frankly, I'm not sure if the Court would then make that determination or the jury would on the facts. We don't really have a lot of law in this area, do we? Pardon me? The points that you've just made. We don't have a lot of case law that would offer guidance. You know, I think the Yamaguta case is probably the best guidance on that, because it talks about the Supreme Court case Merrick, I think, which is cited in Yamaguta. I think we cite that, too. And so that is some decent guidance on that. Okay. The final point I'd like to make, or another point, is my opponent cited, you know, from various studies, different sentences or phrases that they say help them. Excuse me here. She talked about the Biggie case. But an isolated sentence isn't the end all of how you read the study. The studies really need expert input and expert interpretation. Because, for instance, Biggie, in the conclusion, the study found, we conclude that insignificant trace amounts of glucosamine enter human serum after ingestion of a standard dose of glucosamine, 1,500 milligrams, the same amount as in osteobiflex, far below any amount that might contribute directly to chondroitin synthesis. Moreover, this level is limited to a few hours after ingestion, with no establishment of any substantial lasting concentration. My colleague cited Jackson. The very phrase in Jackson was disputed by the experts in the Montero trial. The Montero case, that's a trial that Weibel's counsel took to a jury. The jury looked at the label. It said this conveys a joint health claim, including help for osteoarthritis. It looked at the same science, and it said that the science was false. So the meaning of the studies, it's not they're not appropriately resolved on the pleadings. Okay. But I'm curious, because you just cited a specific example. When the jury was saying what the nature of the claim was, was it doing it in the context of evaluating what the claim was for purposes of evaluating whether it was deceptive, or was it doing it for the purpose of assessing this distinction in the law regarding preemption between a structural function claim and an applied disease claim? Excuse me, Your Honor. They were determining the meaning of the claim conveyed to reasonable consumers. Defendant argued that it was a structural function claim only. We argued no, and we put forward extraneous evidence, not only the label, but also marketing evidence of how it was marketing, who bought it, and the jury concluded that it conveyed a arthritis symptom relief message, and that that message was false based upon the scientific evidence presented. What's the case again? Montero. Montero. That is a Ninth Circuit decision, came out in 2024. And it was a class action, or it wasn't a class action? It was a class action, yes. So why is it, I should know this, and I apologize, but why are we here if there's already been an adjudicated class action on the same issue? Good question. I think that we, and really what Weibel asks here is let us pass the pleading stage, let us get the evidence. Did you not ultimately get relief in the Montero case? Pardon me? What happened with the Montero case? Was that the one that was dismissed? No. No, Montero, we went, we had classes certified. We went past summary judgment. We went to trial. We prevailed at trial on a glucosamine supplement case, and that the jury was affirmed on appeal by the Ninth Circuit. Different glucosamine supplement. Different glucosamine supplement. Yes, I'm sorry, yes, yes. I didn't think I was aware of a, yes, thank you, sir. That product was called joint juice. Yeah, no, I know that case. I was hearing something different. I think we've got everything. That's it for me. I think we're done, actually. Sorry. But I appreciate both your arguments. We will take this under advisement. And I appreciate your filing that. Thank you.